**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Norman Vose, | ) | No. CV-07-834-PHX-LOA |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Michael J. Astrue, Commissioner, Social Security Administration, | ) | |
| Defendant. | ) | |

Plaintiff Norman Vose ("Plaintiff" or "Vose") seeks judicial review of the Commissioner's denial of his application for disability insurance benefits. All parties have consented in writing to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1). (dockets # # 9, 10) Plaintiff and Defendant have filed motions for summary judgment which are fully briefed. As set forth below, the Court denies Plaintiff's motion for summary judgment and grants summary judgment in favor of the Commissioner.

**I. Procedural History**

On April 30, 2003,[1] Plaintiff protectively filed an application under Title II and Part A of Title XVIII for disability insurance benefits under the Social Security Act (the

---

[1] (Tr. 54; "Tr." refers to a copy of the certified transcript of the record filed which the Commissioner filed with his Answer pursuant to Title 42 U.S.C. § 405(g)). (docket # 13 at ¶ 7)

1    "Act"), 42 U.S.C. § 401-33 and § 1395 - 1395ccc,[2] respectively. Plaintiff's *pro se*[3]

2    application for benefits alleged disability starting on October 18, 2002 due to a work-

3    related back injury. (Tr. 54)

4           Plaintiff's application for benefits was denied initially on June 16, 2003 and on

5    reconsideration on February 25, 2004. (Tr. 24-27, 29-32)  Upon counsel's written request

6    received on April 9, 2004, Administrative Law Judge  ("ALJ") Richard D. Wurdeman

7    conducted a hearing on Plaintiff's application on September 13, 2006. (Tr. 35, 15, 47)   In

8    an October 20, 2006 decision, the ALJ determined that Plaintiff "has the severe

9    impairments of degenerative disk disease of the lumbar spine and depression, secondary

10   to chronic pain" within the meaning of the Regulations 20 C.F.R. §§ 404.1520(c) and

11   416.920(b).  (Tr. 19) The ALJ also found that Plaintiff had not engaged in substantial

12   gainful activity ("SGA") since October 18, 2002, the onset date of his alleged disability,

13   and is unable to perform his past relevant work.[4]   The ALJ concluded that Plaintiff "has

14   an RFC [residual functional capacity] for routine work (i.e., minimal changes) at the

15   sedentary exertional level with preclusion from bending to the floor. . . [and] work

16   requiring high quotas or productions expectations."  (Tr. 19)  The ALJ credited the

17

18

19          [2] Title XVIII of the Social Security Act (the "Medicare Act") provides federal health

20   insurance for elderly and disabled persons. Medicare Part A covers inpatient hospital services
     and certain related benefits (§1395c-1395i-4), and is provided automatically for individuals

21   entitled to Social Security retirement or disability benefits (§ 426). *Guadamuz v. Bowen*, 859

22   F.2d 762, 763 (9th Cir. 1988) and *Beverly Community Hosp. Ass'n v. Belshe*, 132 F.3d 1259,
     1262 (9th Cir. 1997).

23

24          After Plaintiff retained counsel, he requested supplemental security income ("SSI")

25   pursuant to Title XVI, 42 U.S.C. §§ 1381-83, of the Act which provides supplemental
     income payments for the aged, blind and disabled.

26          [3] Apparently SSA employee Adelina Newbauer helped Plaintiff complete the April

27   30, 2003 application. (Tr. 89)

28          [4] *Id*., ¶ 9 as defined in the Regulations at 20 C.F.R. § 404.1545. (Tr. 19)

1   testimony of vocational expert, Mr. Jeff Beeman, M. Ed.,[5] that jobs exist in significant

2   numbers in the national economy that Plaintiff could be expected to perform.  (Tr. 18, 19)

3   Specifically, the ALJ determined that Plaintiff is capable of performing sedentary work[6]

4   and cited "jobs [such as] assembler, machine operator and phone clerk." (Tr. 19)  The

5   ALJ denied Plaintiff's claim for benefits finding that Plaintiff was not under a "

6   'disability' as defined in the Social Security Act, as amended, at any time through the

7   date of [his October 20, 2006] decision." (Tr. 19) The ALJ's decision became the final

8   decision of the Commissioner on April 6, 2007, when the Social Security Appeals

9   Council denied Plaintiff's November 3, 2006 request for review. (Tr. 6, 11)

10          Having exhausted the administrative review process, Plaintiff appealed the

11   Commissioner's final determination to this Court pursuant to 42 U.S.C. § 405(g) by filing

12   a timely Complaint on April 20, 2007.  (docket # 1)  On July 10, 2007, Plaintiff moved

13   for summary judgment. (dockets ## 14-16)   On August 14, 2007, the Commissioner filed

14   a response in opposition to Plaintiff's summary judgment motion and Cross-Motion for

15   Summary Judgment (dockets ## 17- 20) to which Plaintiff responded on August 31, 2007.

16   _____

17          [5] Mr. Beeman's *curriculum vitae* is contained in the administrative record. (Tr. 43)

18          [6] The Commissioner classifies physical exertional requirements of work as
    "sedentary," "light," "medium," "heavy," and "very heavy" work. 20 C.F.R. § 404.1567.
19

20          Under 20 C.F.R. § 404.1567(a), sedentary work "involves lifting no more than 10
    pounds at a time, and occasionally lifting or carrying articles like docket files, ledgers and
21   small tools. Although a sedentary job is defined as one which involves sitting, a certain
    amount of walking and standing is often necessary in carrying out job duties. Jobs are
22   sedentary if walking and standing are required occasionally and other sedentary criteria are
    met." 20 C.F.R. § 404.1567(a); *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001).
23

24          Social Security Ruling 83-10 defines "occasionally" as "occurring very little up to
    one-third of the time."
25

26          A Commissioner's regulation also provides that a person who is unable to sit for
    prolonged periods of time is incapable of engaging in the full range of sedentary work. SSR
27   83-12; 257 F.3d at 1035-36.

28

1  (docket # 21)  The Commissioner has not filed a reply. Oral argument has not been
2  requested.  The matter is ripe for ruling.

3  **II.  Standard of Review**

4         The district court must affirm the Commissioner's findings if they are
5  supported by substantial evidence and are free from reversible legal error.   *Smolen v.*
6  *Chater*, 80 F.3d 1273, 1279  (9th Cir. 1996); *Marcia v. Sullivan*, 900 F.2d 172, 174 (9th
7  Cir. 1990).  "Substantial evidence" means more than a mere scintilla, but less than a
8  preponderance; it is "such relevant evidence as a reasonable mind might accept as
9  adequate to support a conclusion."  *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th
10 Cir. 2006).  In determining whether substantial evidence supports a decision, the district
11 court considers the record as a whole, "weighing both the evidence that supports and that
12 which detracts from the ALJ's conclusions," *Reddick v. Chater*, 157 F.3d 715, 720 (9th
13 Cir. 1998), and "may not affirm simply by isolating a specific quantum of supporting
14 evidence." *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989) (internal quotation
15 marks omitted).  The ALJ is responsible for resolving conflicts, determining credibility,
16 and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995);
17 *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  The ALJ is also required to
18 "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant
19 facts," being especially diligent to ensure favorable as well as unfavorable facts are
20 elicited. *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir.1992). If sufficient evidence
21 supports the ALJ's determination, the district court cannot substitute its own
22 determination.  *Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990).  Therefore, if on the
23 whole record before the district court, substantial evidence supports the ALJ's decision,
24 the district court must affirm it. *Hammock*, 879 F.2d at 501; 42 U.S.C.A. § 405(g).

25         Under the Act, a "disability" is defined as an "inability to engage in any
26 substantial gainful activity by reason of any medically determinable physical or mental
27 impairment which can be expected to result in death or which has lasted or can be
28 expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A). An individual is under a disability if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A claimant bears the initial burden of proving that he is disabled. 42 U.S.C. § 423 (d)(5); *Ukolov v. Barnhart*, 420 F.3d 1002, 1104 (9th Cir. 2005); *Reddick*, 157 F.3d at 721. If a claimant shows that he is unable to perform past relevant work, the burden shifts to the Commissioner to show that the claimant "can perform other substantial gainful work that exists in the national economy." *Reddick*, 157 F.3d at 721; *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir.1989); *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2004).

In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ performs a five-step analysis:

(1) if the claimant is performing substantial gainful work, s/he is not disabled.

(2) if the claimant is not performing substantial gainful work, his impairment(s) must be "severe" before s/he can be found to be disabled.

(3) If the claimant is not performing substantial gainful work and has a "severe" impairment(s) that has lasted or is expected to last for a continuous period of at least twelve months, and his/her impairment(s) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is presumed disabled without further inquiry.

(4) if the claimant's impairment(s) does not prevent him/her from doing claimant's past relevant work, s/he is not disabled.

(5) if the claimant's impairment(s) prevents him/her from performing his/her past relevant work, if other work exits in significant numbers in the national economy that accommodates his/her residual functional capacity any vocational factors, s/he is not disabled.

20 C.F.R. §§ 404.1520 and 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 - 41 (1987)(citing 20 C.F.R. §§ 404.1520(b)-(f)); *Reddick*, 157 F.3d at 721. The burden of proof is on the claimant to establish steps one through four. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). Here, the ALJ found that Plaintiff satisfied steps one, two, and four but not step three. If a claimant's impairments do not meet or equal the criteria

for an impairment in the Listing at step three but satisfy the criteria at step four, the evaluation moves to the fifth step. 20 C.F.R. § 404.1520(e).  At the fifth step, the burden of proof shifts to the Commissioner to demonstrate that there are a significant number of jobs in the national economy that claimant can perform. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Thus, the critical issue here is step five: whether Plaintiff retains the residual functional capacity to perform substantial gainful work existing in significant numbers in the national economy in view of his age, education, and work experience.

**III. Commissioner's Findings and Hearing Testimony**

### A. Findings

Plaintiff was born on February 9, 1960, and was forty-six (46) years old on September 13, 2006, the date of the subject hearing.  (Tr. 15, 425)   Plaintiff's highest level of formal education was tenth grade. (Tr. 18, 434)  Plaintiff's past work experience includes employment as a truck driver for a beer distributor where he sustained his back injury, construction worker, and roofer, all at a medium to heavy exertional level. (Tr. at 18, 434-436)  The ALJ concluded that Plaintiff had not engaged in any substantial gainful employment since October 18, 2002.  The ALJ found that Plaintiff had degenerative disk disease of the lumbar spine and depression secondary to chronic pain, which were severe impairments, but did not alone or in combination, meet or equal any listings.  He concluded that Plaintiff had the residual functional capacity ("RFC") for routine sedentary work but was precluded from bending to the floor, and performing work which required high production quotas.  (Tr. 16, 19) The ALJ determined that Plaintiff was unable to perform his past relevant work, but could perform other work existing in the national economy.  (Tr. 18, 19)

### B. Plaintiff's Testimony

Plaintiff testified that he is unable to work because of his lumbar injury and resulting low-back pain, the adverse side effects (dizziness, forgetfulness and inability to concentrate) of his pain medication,  and his psychological problems (depression, anxiety disorder and panic attacks).  (Tr. 425-429)

1  Plaintiff described his back pain as "[p]retty constant" and stated that the pain

2  radiates to his left leg. (Tr. 426) He described the severity of the pain on an "average day"

3  as ranging from 5 to 8 on a scale of 1 to 10 with 10 being the worst. (*Id.* at 426-27) Plaintiff

4  testified that when his "pain level starts increasing" he can relieve the pain by changing

5  positions or laying down. (Tr. 427) He testified that he lays down four to five times a day

6  for about 45 minutes each time. (Tr. 427)

7  Plaintiff also testified about his psychological problems. (Tr. 428) He testified that

8  he feels depressed "pretty much all the time." (*Id.*) He also stated that he takes medication

9  for anxiety and panic attacks "that come out of nowhere." (*Id.*) Plaintiff testified that he has

10  at least three panic attacks per month. (*Id.* at 429) Plaintiff testified that Dr. Stewart

11  prescribed medication for the anxiety attacks which is "helping . . . tremendously . . . ." (*Id.*)

12  He further testified that he was treated by Dr. Saiz[7] in 2002 for a period of six to eight

13  months. (Tr. 430) He testified that Dr. Saiz "removed him from work" and never released

14  him to work. (Tr. 430) When Plaintiff started seeing Dr. Beghin,[8] he was already "off" work.

15  (*Id.*)

16  Plaintiff testified that he lives with his teenage son in an apartment in Flagstaff,

17  Arizona. (Tr. 430) Plaintiff testified that he does "as much [housework] as [he] can" but that

18  he has to sit or lay down after about fifteen minutes. (Tr. 430) He averred that his son goes

19  shopping and cleans the house. (Tr. 430-31) For recreation, Plaintiff goes to movies "once

20  in awhile" and gets up during the movie to "go to the refreshment stand or whatever." (Tr.

21  431) On cross-examination, Plaintiff stated that he drives very little because of the

22  medication he takes. His son does most of the driving. (Tr. 431) Plaintiff further stated that

23  he has a girlfriend who lives in Phoenix. She visits Plaintiff in Flagstaff two to three times

24

25

26  [7] Dr. Saiz' name is misspelled "Sears" in the transcript of the September 13, 2006 hearing.

27

28  [8] Dr. Beghin's name is misspelled "Baneen" in the transcript of the September 13, 2006 hearing.

1  a month and Plaintiff travels to Phoenix twice a month.  (Tr. 432) Plaintiff and his girlfriend

2  go out to eat.  (*Id.*)  Plaintiff testified that walking is difficult because his leg "gives out . .

3  .quite a bit" and then he "can't even move for . . .two days."  (*Id.*) Despite these problems,

4  Plaintiff can take short trips "maybe to the market."  (*Id.* at 433)   Plaintiff testified that

5  sitting in a chair "hurts." (*Id.*)

6              **C. Vocational Expert's Testimony**

7              Vocational Expert ("VE") Jeff Beeman testified regarding Plaintiff's ability to

8  perform work.  The VE characterized Plaintiff's past work as a delivery driver, construction

9  worker, roofer, driver/helper, roofing machine tender as ranging from "medium and heavy"

10 (Tr. 435) and from unskilled to skilled.  (Tr. 435-436)  The ALJ asked the VE to consider

11 several hypothetical situations.

12            **1. Hypothetical One**

13            The ALJ asked the VE to assume an individual who could perform light work with

14 the following limitations: no bending to the floor, no prolonged walking, and routine work

15 which involves minimal changes in routine.  (Tr. 436) The VE testified that a person with

16 such limitations could perform "light-skilled" work which exists in substantial numbers in

17 the United States economy including, but not limited to, "assembler/small products,"

18 "unskilled machine operator," and "unskilled counter clerk." (Tr. 436-37) When adding the

19 limitation of "need[ing] to sit four or five times" every hour, the VE testified that Plaintiff

20 would be unable to perform the foregoing jobs.  (Tr. 437)   The VE further testified that if

21 the Plaintiff only needed to sit four or five times during an eight-hour day, then he would still

22 be able to perform some of the jobs the VE identified.  (Tr. 438)

23            **2. Hypothetical Two**

24            The VE next assumed an individual who could perform work at a sedentary

25 exertional level with the conditions from hypothetical one remaining constant.  The VE

26 testified that such an individual could perform work as an assembler, machine operator, and

27 phone clerk.  (Tr. 438) He clarified that with the limitation of needing to stand half dozen

28 times during the day, ten percent of the jobs would be unavailable.  (Tr. 438) When adding

1  the need to lay down during the day, the VE testified that "I can't think of any work that

2  allows for lying down where he would be employed at any unskilled, sedentary, or light in

3  the United States." (Tr. 439)

4      **3. Cross-Examination of VE**

5      On cross-examination, Plaintiff's counsel asked the VE to consider the assessment

6  by a State agency psychologist who found Plaintiff "seriously limited" and found that

7  Plaintiff had an incapacity to interact with supervisors, deal with work stresses, behave in an

8  emotionally stable manner, relate predictably in social situations, and demonstrate reliability,

9  the VE testified that Plaintiff "would not be employable at either sedentary or light in any

10  unskilled in the United States." (Tr. 439-441)

11      Counsel's second hypothetical asked the VE to consider the GAF score of 40

12  which Dr. Krietsch assessed in 2004.  (Tr. 440) Counsel described a GAF of 40 as causing

13  "severe symptomolgoies in activities of daily living, whether that be academic, vocational,

14  or just normal daily activity." (Tr. 440-441) The ALJ opined that such an individual "would

15  probably not be employable when given counsel's severe vocational [limitations of] not

16  being [able to] interact with co-workers, supervisors, or the public."  (Tr. 441)

17      Counsel's third hypothetical asked the VE to assume an individual with the

18  limitations described by Dr. Stewart which included a "slight impairment" in the ability to

19  understand, remember and carry out short, simple instructions; a "marked impairment" in

20  ability to understand and remember detailed instructions; and "moderate impairment" in

21  ability to make judgments on simple work-related decisions.  (Tr. 442) Counsel also added

22  the slight restrictions on ability to interact with the public; moderate restrictions on ability

23  to interact appropriately with supervisors, co-workers; and extreme restrictions on ability to

24  respond to usual work pressures; and marked restrictions on ability to respond to changes in

25  a routine work setting.  (Tr. 442) Assuming those limitations, the VE testified that Plaintiff

26  would be "unemployable."  (*Id.*  at 443)

27      Finally, counsel asked the VE to assume the limitations described in Dr. Scott's

28  August 2006 assessment.  (Tr. 443, docket # 15, Exh. 1) Dr. Scott indicated "moderately

1    severe pain and fatigue," and a "moderate[ly] severe an impairment which severely affects

2    ability to function."  (Tr. 443) The ALJ found that the hypothetical which was based on

3    Plaintiff's perceived level of pain between 5 and 7 as "pretty vague" and stated that the VE

4    should not have "to analyze whatever 5 to 7 means."  (Tr. 444)

5    **IV. Evidence**

6          Plaintiff and Defendant both submitted separate statements of fact in support of

7    their motions for summary judgment.  Plaintiff's statement of facts is cursory and omits

8    relevant information regarding Plaintiff's medical condition, course of treatment, and

9    participation in treatment.  (docket # 15)  The Court has conducted its own review of the

10   record and discusses the evidence related to Plaintiff's claims below.

11               **A.  Medical Care Related to Physical Health**

12         In May 2002, Plaintiff injured his back while lifting a 40-pound case of beer at

13   work. (Tr. 134, 219, 292, 309)  Plaintiff initially received treatment for his back from Dr.

14   Bronstein at the "Walk-In Clinic" in Flagstaff, Arizona. (Tr. 219)  Dr. Bronstein apparently

15   ordered an MRI of Plaintiff's lumbar spine which was performed on September 9, 2002.  The

16   MRI showed  mild degenerative disc disease throughout the lumbar spine with perhaps "a

17   mass effect upon the exiting right L3 and L4-L5 nerve roots." (Tr. 130-32) Dr. Bronstein also

18   ordered physical therapy.  (Tr. 219)   Treatment notes from Plaintiff's physical therapy in

19   June and July of 2002 reveal that Plaintiff was terminated from physical therapy for

20   repeatedly missing appointments. (Tr. 226-30, 278)

21         Plaintiff began treating with Dr. Paul Saiz, M.D. at the Flagstaff Center for Bone

22   and Joint Disorders on September 24, 2002.  (Tr. 219, 222) On examination, Dr. Saiz noted

23   that Plaintiff had full flexion and extension, normal (2 +) reflexes, normal (5/5) strength,

24   except for the left leg which was 4-/5.  (Tr. 222)  Dr. Saiz noted the MRI findings showed

25   disc dessication and a possible annular tear[9] at lumber level L2-L3.  (Tr. 214)

26

27         [9]  A disc is made of two parts.  The center, the nucleus, is spongy and provides

28   most of the disc's ability to absorb shock. The nucleus is held in place by the *annulus,* a

1      On referral from Dr. Saiz, on October 11, 2003, Dr. Brownsberger administered

2   a nerve root block at L3-L4 and L4-L5.   (Tr. 133, 268) Dr. Brownsberger noted that

3   Plaintiff's pre-procedure description of his pain was "quite vague" and that he had "a

4   difficult time defining the level of pain on the visual analog scale." (Tr. 133) Post-procedure,

5   Plaintiff reported improvement, but Dr. Brownsberger again noted that the report was "rather

6   vague."  (Tr. 133)

7      During an October 18, 2002 follow-up appointment with Dr. Saiz, Plaintiff

8   reported experiencing a 25% decrease in his pain for 24 hours after having the nerve root

9   injections.  (Tr. 214)   Dr. Saiz again recommended epidural injections[10] (nerve root block)

10   and told Plaintiff his goal was to return Plaintiff to work as quick as possible.  (Tr. 214)

11   Plaintiff was vague about his symptoms and indicated he wanted more time off work.  (Tr.

12   210) On October 21, 2002, Dr. Saiz wrote Plaintiff a prescription to excuse him "from work

13   until the effects of the epidurals were ascertained." (Tr. 210)

14      In late October 2002, Plaintiff called Dr. Saiz requesting a second opinion and

15   another prescription to keep him off of work.  (Tr. 210, 212)  Dr. Saiz denied the work

16   excuse because Plaintiff had not made a decision regarding treatment.  Dr. Saiz explained

17   that he was "not willing to keep the patient out of work while he decided on a plan that was

18   proposed to him approximately 13 days before."  (Tr. 210)

19

20

21   series of strong ligament rings which surround it. Ligaments are connective tissues that
     attach bones to other bones. While daily activities may cause the nucleus to press against
22   the annulus, the body can normally withstand this pressure. However, as the annulus ages,
     it tends to crack and tear and is repaired with scar tissue. This process is called
23   degeneration.  As the annulus weakens over time, the nucleus may herniate (squeeze)
     through the damaged annulus. At first, the pressure bulges the annulus outward.
24   Eventually, the nucleus may herniate completely through the outer ring of the disc.

25

26   http://www.orthogate.org/patient-education/lumbar-spine/lumbar-disc-herniation.html

27      [10]  An epidural is an injection of cortisone, an anti-inflammatory medication, into the
     space around the spinal cord (epidural space). A cortisone injection helps decrease
28   inflammation around the nerve roots.  www.mayoclinic.com/health/backpain.

1     On November 12, 2002, Dr. Saiz noted that he was completing a Worker's

2 Compensation Insurance form for Plaintiff. (Tr. 210-11) Dr. Saiz reported that Plaintiff had

3 received nerve root blocks from Dr. Brownsberger and noted Dr. Brownsberger's report that

4 Plaintiff's complaints of pain were vague.  (Tr. 210)  Dr. Saiz noted that his goal was for

5 Plaintiff to return to work "as quick as possible" and if Plaintiff chose not to pursue the

6 treatment options offered, he could not treat him.    (Tr. 210-211)  Dr. Saiz noted that

7 Plaintiff's degenerative changes were "not acute conditions, but were common degenerative

8 conditions" that can start as early as the "third decade." (Tr. 211) He noted that 30% of

9 people in their 20s have signs of degenerative disc disease. (*Id.*)

10     On November 25, 2002, Plaintiff saw Dr. Bradley Nicol, a neurologist, for a

11 second opinion. (Tr. 134-35)  On examination, Dr. Nicol found that Plaintiff had normal

12 reflexes (2+), normal strength (5/5), a normal gait, and "no difficulty with ambulation." (Tr.

13 134) Dr. Nicol noted that the MRI of Plaintiff's lumbar spine showed "mild degenerative

14 changes" but no disk herniation, no lumbar stenosis and no listhesis.  (Tr. 134)  Dr. Nicol

15 found no need for surgery and recommended that Plaintiff continue "with a more formal

16 program of physical therapy" and stay off work until completed. (Tr. 134) Dr. Nicol advised

17 Plaintiff that he might need to pursue less strenuous work.  (Tr. 134-135)

18     On February 18, 2003, Plaintiff returned to Dr. Saiz. (Tr. 193-94) Dr. Saiz noted

19 that he had not seen Plaintiff since October 18, 2002, at which time "there was some question

20 as to wanting to be off work," and "Plaintiff did not like [his] opinion so he went for a second

21 opinion with Dr. Brad Nicol."  (*Id.*)  On examination, Dr. Saiz noted that Plaintiff "really

22 ha[d] no midline tenderness other than some tenderness to palpation over the left buttock."

23 (Tr. 193) Dr. Saiz reviewed Plaintiff's MRI and noted it showed an "annular tear at L2-L3

24 along with some degenerative disk changes at L4-L5, mild foraminal narrowing, that was

25 below the exiting nerve and did not appear to cause any stenosis." (Tr. 193) Dr. Saiz noted

26 that he could not identify the cause of Plaintiff's pain and ordered a discogram, also known

27

28

1   as discography,[11] at L2-L3 and L4-L5 to "see if we have concurrent pain generators at that

2   area." (Tr. 193) He also suggested Intra Discal Electro Thermal Therapy[12] ("IDET"). (Tr.

3   194) Upon Plaintiff's request, Dr. Saiz kept Plaintiff out of work for another month. (Tr.

4   194)

5          In a February 18, 2003 letter to Cindy Stevens of the State Workman's

6   Compensation Fund, Dr. Saiz noted that he had not seen Plaintiff since October 2002, at

7   which time Plaintiff sought a second opinion from Dr. Nicol. (Tr. 191) That letter also noted

8   Dr. Nicol's opinion that no surgical interventions were needed and that Plaintiff might need

9   to change his occupation. (Tr. 191) Dr. Saiz further noted that Plaintiff's MRI showed an

10  annular tear at L2-L3 and "possibly some degenerative disk disease at L4-L5." (Tr. 191) Dr.

11  Saiz noted that he had recommended a discogram. (*Id.*) He also noted that, on Plaintiff's

12  request, he had authorized keeping Plaintiff off work for one more month. (Tr. 191)

13         On March 7, 2003, Plaintiff began treatment with Dr. Michael Wolff, a physiarist.

14  (Tr. 159-61) On examination, Dr. Wolff noted that Plaintiff was "well-developed, well-

15  nourished," and in "no acute distress nor anxiety." (Tr. 160) Dr. Wolff noted Plaintiff had

16  a normal gait and could walk on his heels and toes without difficulty. (Tr. 160) Examination

17  of Plaintiff's low back was "unremarkable." (Tr. 160) Plaintiff's range of motion was

18  decreased secondary to pain, and he had mild paraspinal tenderness.   Plaintiff's lower

19

20  ─────────────────

21      [11]  A discogram, or discography, is used to determine if a particular disc is the source
    of pain. Discograms attempt to reproduce rather than remove pain. The reproduction of pain

22  during a discogram can help determine if injury to a particular disc is the source of a person's
    pain. A discogram, is performed by inserting a needle into the disc and injecting a contrast

23  dye. This extra fluid in the disc increases the pressure in the disc. Patients with an injured
    disc may experience pain that mimics the pain they have been experiencing. The intensity

24  of the pain is recorded on a 0-10 scale. Based upon this information, diagnosis of a particular

25  disc injury can be made.   http://www.medicinenet.com/discogram/article.htm.

26

27      [12]  IDET therapy involves inserting a probe into the affected disc to heat the tissues
    causing them to shrink and cauterizing the small nerve fibers in the periphery of the disc.

28  **www.orthopedics.about.com/od/backneck/a/discpain_2.htm.**

1   extremities showed no muscle atrophy, sensory findings were normal, and he had normal

2   strength. (*Id.*) Dr. Wolff diagnosed multilevel degenerative disc disease, a bulging disc at

3   L3-4 "possibly abutting the right L3 nerve root, a bulging disc at L2-3 with an annular tear,

4   a bulging disc at L4, multilevel lumbar spondylosis, and discogenic low back pain." (Tr. 160)

5   Dr. Wolff indicated that Plaintiff should follow up with Dr. Saiz for a discography to be

6   performed. (Tr. 158,160)

7         On referral from Drs. Wolff and Saiz, on March 21, 2003, Plaintiff underwent a

8   CT scan of his lumbar spine. (Tr. 156-57) The test showed no significant loss of disc height;

9   a slight annular tear at L2-L3; a mild diffuse bulge at L3-L4; an annular tear at L4-L5 with

10  mild diffuse bulging of the disc, and slight to mild facet hypertrophy at L4-L5, without

11  definite deformity of the transiting L4 nerve. (Tr. 157)  The results of a discography

12  performed that same day were essentially the same as the CT scan. (Tr. 153-55)

13        On May 5, 2003, orthopedic surgeon John L. Beghin, M.D., examined Plaintiff

14  who was referred for a second opinion from "SCF[13] of Arizona." (Tr. 136) Plaintiff reported

15  that he had undergone physical therapy, nerve root blocks, and was taking pain medication.

16  (Tr. 136-38) Upon examination, Dr. Beghin noted that Plaintiff had a normal gait, was able

17  to heel and toe walk, had no tenderness in the paralumbar region, could bend 60 degrees

18  without pain, his sensory findings were normal, and the straight leg test was unremarkable.[14]

19  (Tr. 136-137)  Dr. Beghin reviewed Plaintiff's MRI and noted that it showed mild disc

20  dessication. (Tr. 137) He was "uncertain as to the exact etiology of [Plaintiff's] pain

21  complaints in consideration of the fact that the MRI study [was] relatively unimpressive."

22  (Tr. 137) He noted that Plaintiff "was seen only for the purpose of a second opinion at the

23

24        [13]  SCF Arizona is Arizona's largest workers compensation insurance company.
    **www.statefund.com.**

25

26        [14]  In a straight leg test, the patient lays on his back with both legs extended. The
    examiner raises the affected leg toward the patient's head. A positive test for herniated disc

27  produces pain down the back of the leg, below the knee, when the leg is raised up. A
    negative straight-leg test indicates no nerve impingement due to a herniated disc.

28  http://www.webmd.com/back-pain/medical-history-and-physical-exam-for-a-herniated-disc.

1    request of SCF of Arizona and therefore has been provided no advice and has undergone no

2    treatment.  He will be returning to the care of his treating physician."  (Tr. 138)

3              On June 11, 2003, a state agency doctor[15] reviewed the record and completed a

4    physical residual functional capacity assessment.  (Tr. 139-46) The doctor concluded that

5    Plaintiff could perform light work,[16] could sit for six hours in an eight-hour work day with

6    occasional postural activities. (Tr. 140-41) The doctor noted that Plaintiff's gait was normal,

7    he could heel and toe walk, and had normal sensory findings.  He further noted that

8    Plaintiff's complaints were not fully credible because they were not supported by

9    examination findings and Plaintiff's reported activities.  (Tr. 144)

10             On June 16, 2003, Plaintiff had a follow-up examination with Dr. Wolff.  (Tr.

11   151-52) Dr. Wolff noted that Plaintiff had a normal gait and could walk on his heels and toes

12   without difficulty.  Examination of Plaintiff's low back was "unremarkable."  Plaintiff had

13   no sensory loss, full strength, and a negative straight leg raise test. (*Id.*) Dr. Wolff

14   recommended IDET and that Plaintiff continue his medications through Dr. Saiz. (*Id.*)  On

15   September 5, 2003, Dr. Wolff performed an IDET procedure on Plaintiff's lumbar spine.

16   (Tr. 148-150)

17             Thereafter, Dr. Saiz referred Plaintiff to physical therapy at the Flagstaff Medical

18   Center. (Tr. 179)  On November 1, 2003, physical therapist, Tom DeMoulin, reported that

19   he planned to see Plaintiff two to three times a week for the next six weeks for "soft tissue

20   mobilization, joint mob[ility], core stabilization, and therapeutic exercise."  (Tr. 179-80)

21   DeMoulin noted that Plaintiff's ranges of motion were within normal limits although Plaintiff

22   reported pain. (Tr. 179) Plaintiff also had low muscle tone, poor core control, and poor body

23   awareness, including over-utilizing his back during exercises resulting in pain.  (Tr. 180)

24

25

26             [15]  The name of the reviewing doctor is illegible. (Tr. 139-46)

27             [16]  Light work involves lifting no more than twenty pounds at a time with frequent

28   lifting or carrying objects up to ten pounds.  20 C.F.R. § 404.1567(b).

1    On November 18, 2003, Dr. Saiz saw Plaintiff for a follow-up examination.  He

2    noted Plaintiff's pharmacy had notified him that Plaintiff presented an altered prescription

3    for Oxycontin, which was one month old and increased the dosage from the original 10mg

4    to 40mg.  (Tr. 177)  Dr. Saiz did not perform a physical examination but opined that he did

5    not consider Plaintiff a surgical candidate.  Dr. Saiz further noted that Plaintiff had "broken

6    our contract as to narcotic use," and that he did not feel he could treat Plaintiff in the future.

7    (Tr. 177)

8    On December 5, 2003, Leo Kahn, M.D., a state agency doctor, reviewed the

9    record and completed a residual functional capacity assessment. (Tr. 235-42) Dr. Kahn

10    concluded that Plaintiff could perform light work with the ability to sit for six hours in an

11    eight-hour day and occasional postural activities. (Tr. 236-37) In support of his assessment,

12    Dr. Kahn noted that Plaintiff had full strength in his legs, a normal gait, was able to heel and

13    toe walk, and his straight leg raise test was negative to 90 degrees, and he could bend 60

14    degrees.  (Tr. 263)  Dr. Kahn further noted that "the severity of [Plaintiff's] allegation[s]"

15    were not fully credible because he was able to cook, perform light housework, and wash

16    clothes.  (Tr. 240)

17    On referral from Dr. Saiz for management of low-back pain, on December 18,

18    2003, Dr. Brownsberger treated Plaintiff.  (Tr. 262-64) Dr. Brownsberger indicated that the

19    IDET treatment that Plaintiff had received in September of 2003 did not provide relief.  He

20    also noted that Dr. Saiz had terminated Plaintiff's treatment due to his prescription altering,

21    and that Dr. Saiz did not consider Plaintiff a surgical candidate.  (Tr. 262)  Upon

22    examination, Dr. Brownsberger noted that Plaintiff's "flexion and extension are guarded and

23    slightly limited."  (Tr. 263)  He noted that Plaintiff reported more pain upon extension than

24    flexion.  (Id.)  Plaintiff's reflexes were symmetrical and he had "good strength" and intact

25    sensation.  Plaintiff did not bring his MRI for review.  Dr. Brownsberger noted that Plaintiff

26    was being treated "in the context of the industrial system," thus he felt "it was [his] duty to

27    define for him modified work activities." (Tr. 263) Accordingly, Dr. Brownsberger noted that

28    Plaintiff was "given a modified work release with limited lifting and bending and the ability

1    to reposition himself on a regular basis." (*Id.*)  Dr. Brownsberger noted Plaintiff's

2    "depression" and recommended eight to twelve visits with psychologist Kelly Krietsch,

3    Ph.D., for cognitive behavioral intervention.  (Tr. 263-64)

4            On referral from Dr. Brownsberger, on March 23, 2005, Dr. Gabriel Bonilla, an

5    orthopedist, examined Plaintiff.  (Tr. 353-55) Dr. Bonilla noted that Plaintiff presented in

6    "mild distress." (Tr. 354) He walked with "a tilted posture towards the right."  Dr. Bonilla

7    noted "severe paraspinal muscle spasms on the left" and decreased range of motion in all

8    spinal planes "secondary to pain and a pulling sensation." (Tr. 354)  Plaintiff had full

9    strength, normal reflexes and sensory findings.  Dr. Bonilla noted that Plaintiff had been

10   "taking a significant amount of narcotics . . . [for about] a year and a half." (Tr. 354) Dr.

11   Bonilla recommended further electrodiagnostic evaluation, physical therapy, a new MRI of

12   the lumbar, and medication. (Tr. 355) Dr. Bonilla, however, would not prescribe Oxycontin.

13   (*Id.*)

14           During a follow-up visit on April 15, 2005, Dr. Bonilla noted that Plaintiff was

15   no longer taking oxycodone or Oxycontin, and [was] happy with the results." (Tr. 352) Dr.

16   Bonilla recommended epidural steroid injections.  (*Id.*)

17           In April 2005, Plaintiff began treatment with Randall Scott, M.D., a primary care

18   physician. (Tr. 386)  On examination, Dr. Scott noted that Plaintiff appeared healthy for his

19   age and well-nourished.  He had normal reflexes and no paraspinal discomfort.  Dr. Scott

20   refilled Plaintiff's prescriptions for Morphine and Oxycodone. (Tr. 385) Dr. Scott diagnosed

21   lumbago, radiculopathy, lumbar disc disorder, and reflux esophagitis. (Tr. 373) Plaintiff saw

22   Dr. Scott approximately once a month form April 2005 through January 2006, and then once

23   in March 2006 and June 2006.  (Tr. 362-87) Plaintiff repeated his complaints of low back

24   pain.  Dr. Scott consistently described Plaintiff as being in no acute distress ("NAD"). Dr.

25   Scott's most significant examination findings noted lumbar discomfort with range of motion

26   testing and palpation, and rising with a stopped and stiff posture.  (Tr. 364, 382)

27           Additionally, on May 3, 2005, Plaintiff reported to Dr. Scott that he could only

28   perform 15-20 minutes of housework before experiencing severe low back pain. (Tr. 384-85)

1     Dr. Scott also noted that Plaintiff's only exercise was walking to the mailbox and occasional

2     stretching. (Tr. 382) On June 2, 2005, Plaintiff reported to Dr. Scott that he had injured his

3     back "installing an air filter in his car" and requested an increase in his pain medication. (Tr.

4     382) Dr. Scott refused to increase Plaintiff's pain medication and reviewed stretching and

5     self-massage techniques to keep Plaintiff's "back in the best possible condition." (Tr. 383)

6

7            On June 30, 2005, Plaintiff was examined by Dr. Bonilla. (Tr. 351) He reported

8     that steroid injections did not help. (Tr. 351) On examination, Plaintiff "show[ed] a

9     significant amount of pain." However, his sensory motor strength and reflexes were normal,

10    straight leg raise test was negative, and Plaintiff's report of lumbar pain was not significant.

11    (Tr. 382) Dr. Bonilla recommended facet joint injections. (*Id.*)

12           On October 13, 2005, Dr. Bonilla noted that throughout his treatment, Plaintiff

13    has "failed to go to physical therapy." (Tr. 349) Dr. Bonilla "insisted . . . that he has to go

14    to physical therapy and it is an integral part of his treatment." (Tr. 349) Dr. Bonilla noted

15    that there was "nothing else procedure wise [he] would recommend." (Tr. 349)

16           On January 23, 2006, Plaintiff requested a "6-month temporary disability permit

17    for his vehicle since [he] is still having significant low back pain." (Tr. 348) Dr. Bonilla

18    prescribed the disabled parking permit. (Tr. 348) On March 2, 2006, Dr. Bonilla ordered

19    more nerve block injections at L5-SI. (Tr. 347)

20           On April 14, 2006, Dr. Bonilla noted that Plaintiff had not followed his

21    recommendation regarding nerve block injections. (Tr. 346) Plaintiff also failed to get an

22    MRI because "he was busy doing other things and could not find the time to get to it." (Tr.

23    346) Plaintiff had only mild tenderness upon examination.

24           On May 8, 2006, Plaintiff had another MRI of his lumbar spine. (Tr. 344-45) The

25    study showed moderate stenosis at L4-5 with "slight interval progression and worsening

26    since the previous study of 09/09/2002," and "multilevel lumbar degenerative disc disease

27    and annular bulging at other levels, which [did] not result in significant canal stenosis or

28

1  nerve root sleeve amputation." (Tr. 345) The study further showed that Plantiff's spine was
2  "relatively stable since the previous study." (*Id.*)

3          On May 17 and July 18, 2006, Plaintiff reported to Dr. Bonilla that injections did
4  not help. (Tr. 341-43) Dr. Bonilla referred Plaintiff to Donald D. Hales, M.D. for a surgical
5  consultation. (*Id.*)

6          On July 24, 2006, Dr. Hales conducted a neurosurgical evaluation. (Tr. 339-40)
7  Dr. Hales  found that Plaintiff was well-developed and in no acute distress, his reflexes were
8  normal, he had only minimal weakness in his left leg, and a "weakly positive" straight leg
9  raise test in the sitting position.  Dr. Hales noted that there was little change between
10 Plaintiff's MRI studies performed in 2002 and 2006. (Tr. 340) He noted that, due to the
11 multilevel degeneration of Plaintiff's discs, "surgical intervention for back pain would most
12 likely be unhelpful and probably lead to multiple surgeries." (Tr. 340) Dr. Hales indicated
13 a one-level surgery "may be appropriate," but he also noted that mechanical back pain was
14 "unlikely to be helped with that surgery." (*Id.*)  He told Plaintiff to consider their discussion
15 before making a decision about surgery. (Tr. 340)

16              **B.  Medical Care Related to Mental Health**

17          Plaintiff received treatment at the Guidance Center in Flagstaff, Arizona several
18 times between August 7, 2001 to December 2003. (Tr. 235-60) On August 7, 2001, Plaintiff
19 reported that he was depressed. (Tr. 258) Treatment notes describe Plaintiff's depression as
20 episodic. (*Id.*)  Plaintiff reported that anti-depressants did not work and that he would "just
21 like to get pain pills [and] feel good." (Tr. 258) Plaintiff reported altering a prescription for
22 narcotics and said that "I guess I didn't get caught." (Tr. 258) Treatment notes indicate that
23 Plaintiff might be addicted to pain pills he took "all the time."  Plaintiff denied an addiction.
24 (Tr. 258)

25          On August 7, 2001, Plaintiff was assessed with adjustment disorder, depressed
26 type, and "probable . . . narcotic abuse." (Tr. 260) He was described as anxious because his
27 "unemployment was running out."  Treatment notes also indicated that Plaintiff was
28 "working [with] voc[ational] rehab[ilitation] for employment." (*Id.*)

1    Guidance Center treatment notes dated September 9, 2002 indicate that Plaintiff

2    had "missed nearly all scheduled . . .appointments and had failed to respond to repeated

3    attempts at contact." (Tr. 257) The signature of the individual who completed the form is

4    illegible. (Tr. 257) Plaintiff was discharged from treatment. (Tr. at 256)

5    In December 2003, Plaintiff returned to the Guidance Center for an evaluation

6    for benefits under the SSA. He reported depression and "daily panic attacks." (Tr. 244,253)

7    He reported no difficulties with self care. (Tr. 244) His provisional diagnoses were major

8    depressive disorder, general anxiety disorder, and panic disorder. (Tr. 244, 252) Plaintiff was

9    assessed a GAF score of 56.[17]

10    Upon referral from Dr. Brownsberger, on January 12, 2004, Plaintiff was treated

11    by Dr. Krietsch, Ph.D, a psychologist. (Tr. 404-07) Plaintiff reported that physical therapy

12    "aggravated his pain," but that medication was "somewhat helpful." (*Id.*) Plaintiff denied

13    abusing pain medication or engaging in other addictive behavior. (Tr. 404) Dr. Krietsch

14    noted that Plaintiff had "a very significant psychiatric history even though he has not

15    undergone a great deal of treatment." (Tr. 404) Upon testing, Dr. Krietsch noted that

16    Plaintiff scored very low on defensiveness, which she opined could be a "cry for help," a

17    "desire to convince others of the seriousness of his plight," or "an exaggeration of symptoms

18    for secondary gain." (Tr. 405) Dr. Krietsch noted that "this bias raises questions about the

19    accuracy and objectivity of [Plaintiff's] self-reports." (Tr. 405) She stated that "[c]ertainly,

20    symptom magnification appears to be operating with this patient." (Tr. 405) Dr. Krietsch

21    noted Plaintiff showed "an extreme level of diffuse somatic complaints," which was unlikely

22    caused by a single medical condition. (*Id.*) She further noted that Plaintiff displayed an

23    "unusually high level of pain complaints," noting that such patients "tend to perceive

24

25    ───────────

26    [17] A GAF score of 51-60 is indicative of moderate symptoms such as a flat affect or
occasional panic attacks, or moderate difficulty in social, occupational or school functioning

27    such as having few friends or conflicts with peers or co-workers. American Psychiatric
Association, *Diagnostic and Statistical Manual of Mental Impairments*, 4th text revision,

28    2000, p. 34 (DSM-IV-TR).

1   themselves as being totally disabled with regard to most functions and activities." (Tr. 405)

2   "[G]iven the objective medical findings," Dr. Krietsch noted that Plaintiff "may be strongly

3   motivated to assume a disability role." (Tr. 406) Dr. Krietsch also noted that Plaintiff had

4   a high level of depressive complaints and extreme anxious thoughts and feelings. (Tr. 406)

5   Dr. Krietsch diagnosed major depression, recurrent and severe, anxiety disorder not

6   otherwise specified, and rule out psychotic disorder. (Tr. 406)  She assessed a GAF score

7   of 40.[18]  She indicated that Plaintiff appeared to be a candidate for a psychological approach

8   to pain management.  She stated, "a psychiatric evaluation was warranted." (Tr. 406)

9          Dr. Krietsch saw Plaintiff again on January 20 and 26, 2004. (Tr. 402-03)

10   Plaintiff expressed anxiety about telling his supervisors about his work restrictions. (Tr. 403)

11   Dr. Krietsch discussed coping strategies and Plaintiff's upcoming psychiatric consultation

12   with Dr. Ernest Stewart at the Guidance Center.  (Tr. 403) Dr. Krietsch "hope[d] that . . .

13   [Plaintiff] would be placed on medication that would address his anxiety response and his

14   depression." (Tr. 403)

15          Plaintiff saw Dr. Krietsch again on February 2, 2004 after his consultation with

16   Dr. Stewart.  (Tr. 401) Plaintiff reported that Dr. Stewart had prescribed Zoloft and valium.

17   (Tr. 401) Dr. Krietsch noted that Plaintiff was resistant to returning to work which she

18   attributed to his anxiety. (*Id.*)

19          On January 27, 2004, Dr. Patricia Rose performed a consultative examination at

20   the request of the State agency. (Tr. 313-18) On a mental status examination, Dr. Rose noted

21   that Plaintiff's "mental status appeared to be within normal limits . . . with the exception of

22   mild difficulty with short-term memory." (Tr. 313)   Plaintiff reported experiencing

23   depression since his accident in 2002, but "he said that he also experienced some depression

24   before the accident." (Tr. 314) Plaintiff reported symptoms of depression including fatigue,

25

26          [18]  A GAF score of 31-40 is indicative of impairment in reality testing, impairment in
   speech and communication, or serious impairment in several of the following: occupational
27   or school functioning, interpersonal relationships, judgment, thinking, or mood. DSM-IV-TR
28   at 34.

feelings of worthlessness, spending money frivolously, cleaning obsessively, or leaving town without a destination.  (Tr. 315) Dr.  Rose noted that Plaintiff reported symptoms of anxiety that "were very vague," and noted that "it was difficult to determine if he was truly experiencing a panic attack or simply situational anxiety." (Tr. 315) Plaintiff reported having full custody of his 13-year-old son.  (Tr. 315) He reported that he typically gets up at 7:00 a.m. and then checks his electronic mail and bank account online.  (Tr. 316) During the day, Plaintiff watches television, cleans the house, cooks dinner, and eats with his son.  In the evening, he watches more television and usually goes to bed around 10:00 p.m.  (Tr. 316)

Plaintiff reported to Dr. Rose that he had worked as a delivery driver, roofer, and for a golf club manufacturer.   (Tr. 316) He said he was fired from the golf club manufacturing job for "cussing at his supervisor." (Tr. 316) He had previously been "written up" at that same job. (Tr. 316) Plaintiff reported that he had "some insubordination problems in jobs," and that he was fired or quit "several roofing jobs because he disagreed with how the job should be done."  (*Id.*)  He reported that while he had a history of arguing with supervisors, "he usually had no problems getting along with customers." (Tr. 316) Plaintiff cited back pain and "depression" as his primary obstacles to returning to work.  (Tr. 316)

Dr. Rose noted that a physician would have to assess "the validity of [Plaintiff's] reported medical problems and their impact on his ability to perform work-related activities." (Tr. 317) From a psychiatric perspective, Dr. Rose opined that Plaintiff "did not present with any major personality disorder." (Tr. 317) She indicated that he was primarily experiencing depressive symptoms  and occasional manic symptoms related to back pain.  She noted, however, that Plaintiff reported having "these symptoms for years and in spite of that he last worked in October 2002, approximately 15 months ago." (Tr. 317) Dr. Rose further noted that Plaintiff "also worked for about 20 years, in spite of his reported symptoms, which suggest[s] that his symptoms are not as severe as he might have indicated." (Tr. 317) She acknowledged that Plaintiff's symptoms had been exacerbated by his accident, but noted that

1    if he was able to successfully manage his pain, his depressive symptoms would decrease.

2    (Tr. 317)

3              Dr. Rose noted that "[c]ertainly, [Plaintiff] does not appear to be experiencing any

4    major psychiatric disorders that would logically preclude him from performing work-related

5    activities, given that he had worked for 20 years in spite of his reported . . . depression and

6    manic symptoms." (Tr. 317) Dr. Rose also noted that Plaintiff appeared to be a good

7    candidate for vocational rehabilitation. (Tr. 317)

8              Dr. Rose also completed a functional capacity assessment form. (Tr. 319-20) She

9    opined that Plaintiff had a "good ability to follow work rules, relate to co-workers, deal with

10   the public, use judgment, function independently, maintain attention and concentration,

11   understand, remember and carry out simple job instructions, and maintain personal

12   appearance. (Tr. 319-20) "Good" was defined as "limited but satisfactory." (*Id.*) She further

13   indicated that Plaintiff's ability to understand, remember and carry out complex instructions

14   was "poor." (Tr. 320) She also opined that Plaintiff's ability to interact with supervisors,

15   deal with work stress, understand, remember and carry out "detailed but not complex"

16   instructions, behave in an emotionally stable manner, relate predictably in social situations,

17   and demonstrate reliability was "fair." (Tr. 319-20) "Fair" was defined as "seriously limited

18   but not precluded." (Tr. 320) Dr. Rose explained her assessment of "fair" as related to

19   Plaintiff's ability to behave in an emotionally stable manner, relate predictably in social

20   situations, and demonstrate reliability, as based on Plaintiff's "past history of insubordination

21   with supervisors." (Tr. 320)

22             On February 9, 2004, Plaintiff complained to Dr. Krietsch of increased pain due

23   to "doing more activities around his home." (Tr. 400) Plaintiff reported improvement in his

24   anxiety, but not his depression. Dr. Krietsch conducted a "mind-body induction . . .with the

25   assistance of psychophysiological feedback." (Tr. 400) She "could tell from [Plaintiff's]

26   behavior and from the electro-dermal response that he was resisting the procedure." (Tr. 400)

27   Dr. Krietsch noted that Plaintiff "appears to be quite invested in his pain and does not engage

28   in cognitive-behavior therapy or taking responsibility for his own self care." (Tr. 400) She

1   further opined that Plaintiff "resists whatever intervention we try," was not "motivated to

2   pursue psychological therapy, and in fact appear[ed] to be making efforts to undermine any

3   chance of success." (Tr. 400) As a consequence, Dr. Krietsch discharged Plaintiff from

4   treatment. (*Id.*)

5          On February 11, 2004, Francis A. Enos, Ph.D, a psychologist, reviewed the

6   record and completed psychiatric review technique and mental functional capacity forms.

7   (Tr. 321-24, 325-27)  Dr. Enos opined that Plaintiff had affective disorder that resulted in

8   mild restrictions in his activities of daily living, maintaining social functioning, and

9   maintaining concentration, persistence and pace. (Tr. 322-23) Plaintiff had no episodes of

10  decompensation.  (Tr. 323)  Dr. Enos explained that his conclusions were based on Dr.

11  Rose's findings that Plaintiff did "not appear to be experiencing any major psychiatric

12  disorder that would logically preclude him from performing work related activities." (Tr.

13  324) Dr. Enos opined that Plaintiff was not significantly limited in 14 of 20 categories of

14  work-related functions, and that there was "no evidence of limitation" in the remaining

15  categories. (Tr. 325-26) Dr. Enos concluded that Plaintiff could "remember and carry out

16  simple instructions, work cooperatively, do personal planning, interact with peers, [the]

17  public and supervisors, work within a routine and a schedule, and complete a routine work

18  week within his physical limitations." (Tr. 327)

19         A February 24, 2004 behavioral health update completed by Stephanie Knorr,

20  clinical liason, and Patrese Metz, a "behavioral health professional," at the Guidance Center

21  indicates that Plaintiff had major depression and problems with back pain and "workers

22  comp." (Tr. 399)  Plaintiff was assessed a GAF score of 65.[19]  A May 1, 2005 behavioral

23  health update completed by Ms. Knorr and Debbie Maxwell, "CLS program manager,"

24  indicates that Plaintiff was depressed and had low back pain.  Plaintiff was assessed a GAF

25  score of 61.  (Tr. 396-97) A May 3, 2006 behavioral health update completed by Ms. Knorr

26

27         [19] A GAF score of 61-70 is indicative of mild symptoms in one area, or difficulty in
    social, occupational, or educational functioning. However, the individual is generally

28  functioning well and has some meaningful interpersonal relationships.  DSM-IV-TR at 34.

1  and Dr. Ernie Stewart indicated that Plaintiff had still not achieved "medication compliance."

2  (Tr. 388-89) Plaintiff was diagnosed with panic disorder with agoraphobia,[20] post-traumatic

3  stress disorder, and borderline personality disorder.  (Tr. 388-89) The report also noted that

4  "generally, things were o.k.," and assessed a GAF score of 81.[21]  (*Id.*)

5          On September 5, 2006, Ernie Stewart M.D., with the Guidance Center, completed

6  a "Supplemental Questionnaire as to Residual Functional Capacity," (Tr. 407-08) Dr. Stewart

7  indicated that Plaintiff's abilities to understand, remember and carry out short, simple

8  instructions and interact with the public were only slightly limited.  (Tr. 407)  A "slight

9  limitation" was defined as "some mild limitations, [but] claimant can generally function

10  well." (*Id.*) Dr. Stewart opined that Plaintiff's abilities to make judgments on simple, work-

11  related decisions and to interact appropriately with supervisors and co-workers was

12  moderately limited.  (Tr. 407-08)  A "moderate limitation" was defined as "moderate

13  limitations, [but] claimant functions well."  (Tr. 407)  Dr. Stewart indicated that Plaintiff's

14  ability to understand and remember detailed instructions was "markedly limited."  (Tr. 407)

15  A "marked limitation" was defined as "serious limitations, ability to function is severely

16  limited."  (Tr. 407) Dr. Stewart opined that Plaintiff's limitations in his ability to respond

17  appropriately to work pressure in a ususal work setting was "extreme," which was defined

18  as "major limitation, no useful ability to function."  (Tr. 407-408)  Dr. Stewart did not

19  provide any "medical/clinical findings" in support of his assessment, even though the form

20  specifically requested such information.  (Tr. 408)

21

22

23  _____

24      [20]   Agoraphobia is an abnormal and persistent fear of public places or open areas,
   especially those from which escape could be difficult or help not immediately accessible.

25  People with agoraphobia also usually have panic disorder.  www.medterms.com.

26

27      [21]   A GAF score of 81-90 indicates the individual has few or no symptoms, good
   functioning in several areas and no more than everyday problems or concerns.  DSM-IV-TR

28  at 34.

C.  Medical Evidence Submitted by Plaintiff

In addition to the foregoing, attached to Plaintiff's statement of facts is a form entitled "Medical Assessment of Ability to Do Work Related Activities" which Dr. Scott completed on August 30, 2006.  (docket # 15, Exh. 1 at 3-5) Dr. Scott circled numbers which indicate that, during an eight-hour work day, Plaintiff could sit for 0-1 hours, or stand/walk for 0-1 hours, and that he could frequently lift up to 5 pounds and occasionally lift 10 pounds, and could carry up to 5 pounds occasionally.  (*Id.* at 3-4) Dr. Scott indicated that Plaintiff could use both hands for continuous actions such as grasping, pushing or pulling, or fine manipulations; he could use his feet for repetitive motions such as pushing controls; he could not bend, squat, crawl, or climb and could reach occasionally. (*Id.* at 4)  He should not be exposed to work-place hazards, or changes in temperature and only have limited exposure to respiratory irritants.  (docket #  15, Exh. 1 at 4)  Dr. Scott indicated that Plaintiff's activities were limited by pain and fatigue to a "moderately severe" level. (*Id.* at 5) Dr.  Scott indicated that his assessment could "be reasonably expected to result from a medically determinable impairment as set forth in the diagnostic impression in your narrative report."  (*Id.*)  However, there is no "narrative report" attached to Dr. Scott's assessment and he did not include any remarks or comments to explain his assessment.  (*Id.*)

**V. Analysis**

In his Motion for Summary Judgment, Plaintiff claims "that the ALJ's decision is arbitrary and capricious and contrary to law" and, therefore, requests the Court "vacate the decision of the ALJ" and "grant his disability status." (docket # 16 at 2, 7) The Motion for Summary Judgment presents two main grounds for relief: (1) the ALJ erred by rejecting the opinions of  Plaintiff's treating doctors, Dr. Krietsch, Dr. Stewart, Dr. Saiz, Dr. Scott, and Dr. Nicol; and (2) the ALJ failed to consider "the assessment of Dr. Scott as it appears that opinion never was placed in the record although the Office of Disability Adjudication and Review received it."  (*Id*. at 7) Plaintiff also raises several sub-arguments which the Court will address.  Plaintiff requests that the Court remand for an award of benefits.  In response to Plaintiff's Motion and in the Cross-Motion for Summary Judgment, the Commissioner

1    frames the issues as follows: (1) the ALJ did not err in concluding that Plaintiff was not

2    mentally disabled; and  (2) the ALJ did not err in concluding that Plaintiff was not physically

3    disabled. (docket # 20 at 2, 6) The Court will address these arguments below.

4                              **A.  Weight Assigned to Physicians' Opinions**

5                 Title II's implementing regulations distinguish among the opinions of three types

6    of physicians: (1) those who treat the claimant (treating physician); (2) those who examine

7    but do not treat claimant (examining physician); and (3) those who neither treat nor examine

8    the claimant (non-examining physician).  20 C.F.R. § 404.1527(d).  Ordinarily, the opinion

9    of a treating or examining doctor is given more weight than the opinion of a nonexamining

10   source. 20 C.F.R. §§ 404.1527(d)(1),(2); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996)(as

11   amended); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  If a treating or

12   examining physician's medical opinion is supported by medically acceptable diagnostic

13   techniques and is not inconsistent with other substantial evidence in the record, that

14   physician's opinion is given controlling weight. 20 C.F.R. § 404.1527(d)(2); Social Security

15   Ruling (SSR) 96-2p; *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001).  However,

16   "the treating physician's opinion. . .is not necessarily conclusive as to either a physical

17   condition or to the ultimate issue of disability."  *Magallanes*, 881 F.2d at 751.  A treating

18   physician's opinion may be given controlling weight only if it is well-supported by medically

19   acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the

20   other substantial evidence in the record.  See, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)

21   (1999). If a treating physician's opinion is "brief and conclusionary in form with little in the

22   way of clinical findings to support [its] conclusion," an ALJ need not accept it.  *Magallanes*,

23   881 F.2d at 751.  An ALJ may not reject a treating physician's opinion unless the ALJ

24   "makes findings setting forth specific legitimate reasons for doing so that are based on

25   substantial evidence in the record."  *Smolen*, 80 F.3d at 1285.  If the treating physician's

26   opinion is uncontroverted, the ALJ's reasons for rejecting the opinion must be clear and

27   convincing.  *Id.*

28

1    Mindful of the foregoing principles, the Court concludes that the ALJ properly

2  assessed the opinions of treating physicians and assigned those opinions appropriate weight.

3    **B. Assessment of Plaintiff's Mental Health**

4    Plaintiff argues that the ALJ erred in rejecting the opinions of the treating

5  psychologist, Dr.Krietsch, and treating psychiatrist, Dr. Stewart, which Plaintiff claims

6  "indicated restrictions which would not allow for sustained employment." (docket # 16 at 2)

7    The ALJ found that Plaintiff had depression secondary to pain, which was a

8  severe impairment.  (Tr. 16, 19) The ALJ concluded, however, that Plaintiff's mental

9  impairment limited him to routine work, described as work with minimal changes in routine,

10  no high production quotas, or production expectations.  Contrary to Plaintiff's assertion, in

11  reaching this conclusion, the ALJ properly evaluated the opinions of the treating doctors and

12  the ALJ's decision is supported by substantial evidence in the record.

13    **1. Dr. Krietsch's Opinion**

14    Plaintiff claims that Dr. Krietsch opined that he was disabled and that the ALJ

15  failed to adequately explain his reasons for rejecting that opinion.  Specifically, Plaintiff

16  argues that Dr. Krietsch's assessment of a GAF score of 40 during her initial examination of

17  Plaintiff in January of 2004 indicates that she considered Plaintiff unable to work.  (Tr. 406)

18  Plaintiff's argument fails because his characterization of Dr. Krietsch's opinion focuses on

19  a single aspect of Dr. Krietsch's treatment notes which does not directly correlate with

20  disability and ignores other significant portions of her treatment notes.

21    As an initial matter, Plaintiff cites no authority for his implication that a GAF

22  score equates with disability.  Moreover, courts have specifically held that a GAF score does

23  not directly correlate to disability.  65 Fed Reg. 50746, 50764-65 ("The GAF score . . . does

24  not have a direct correlation to the severity requirements in [SSA's] mental disorder

25  listings"); *Howard v. Comm'r. of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)(GAF score may

26  assist ALJ in formulating a claimant's RFC, but is not essential). Similarly, the Ninth Circuit

27  has found that a claimant with a GAF score 40 was not disabled.  *See*, *Bayliss v. Barnhart*,

28  427 F.3d 1211, 1217 (9th Cir. 2005)(claimant with a GAF score of 40 was not disabled);

1 *Morgan v. Comm'r. of Soc. Sec.*, 169 F.3d 595, 600 (9th Cir. 1999)(claimant with GAF scores

2 ranging from 45 to 61 was not disabled)

3   The ALJ acknowledged the GAF score of 40 which Dr. Krietsch assessed in

4 January of 2004 and assigned little weight to that score because it was inconsistent with her

5 other treatment notes. (Tr. 17, 406) The ALJ's decision is supported by substantial evidence

6 in the record as set forth below.

7   Dr. Krietsch treated Plaintiff from January 12, 2004 to February 9, 2004. (Tr.

8 400-406) Her treatment notes indicate that she did not consider Plaintiff unable to work.

9 Rather, she noted that Plaintiff exaggerated his symptoms, was invested in his pain, did not

10 participate in treatment, and resisted self-management of pain control. (Tr. 401-06)

11 Specifically, at her initial examination of Plaintiff, Dr. Krietsch noted that Plaintiff's test

12 scores were consistent with "an exaggeration of symptoms for secondary gain." (Tr. 405)

13 She further noted that "this bias raises questions about the accuracy and objectivity of

14 [Plaintiff's] self-reports." (*Id.*) Dr. Krietsch also stated that "[c]ertainly, symptom

15 magnification appears to be operating with this patient." (*Id.*)

16   During subsequent evaluations, Dr. Krietsch tried to teach Plaintiff "cognitive

17 coping strategies" (Tr. 403) and psychological approaches to anxiety management (Tr. 402)

18 which Plaintiff "resisted." (Tr. 402)   In her February 2, 2004 treatment notes, Dr. Krietsch

19 expressed concern that Plaintiff would "resist and undermine" mind-body techniques for

20 controlling anxiety. (Tr. 401)

21   In her final evaluation of Plaintiff on February 9, 2004, Dr. Krietsch noted that

22 Plaintiff was unmotivated to improve, was "quite invested in his pain" and was "making

23 efforts to undermine any chance of success." (Tr. 405)  She further stated that, Plaintiff

24 "resist[ed] whatever intervention we try," Plaintiff was not "motivated to pursue

25 psychological therapy," and he "does not engage in the process of cognitive-behavior therapy

26 or taking responsibility for his own self care." (Tr. 400)  As a consequence, Dr. Krietsch

27 discharged Plaintiff from treatment. (Tr. 400)

28

1         In summary, contrary to Plaintiff's assertion, Dr. Krietsch never opined that

2 Plaintiff could not work or was disabled.  Rather, her treatment notes reveal that Plaintiff

3 undermined his treatment and was not motivated to improve.  The ALJ did not err in failing

4 to assign more weight to Dr. Krietsch's initial assessment of a 40 GAF score which was not

5 supported by her subsequent treatment notes and does not directly correlate with disability.

6 *See* 20 C.F.R. § 404.1527(d)(3)(the weight given a medical source opinion is proportional

7 to the degree to which it is supported with medical signs and laboratory findings.); *Batson*

8 *v. Comm'r. Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir. 2004)(ALJ properly rejected opinion of

9 treating physicians as they "lacked substantive medical findings to support her conclusion.");

10 *Thomas v. Barnhart*, 278 F.3d 948, 957 (9th Cir. 2002)(treating physician's opinion may be

11 rejected if unsupported by doctor's examination record).

12         Plaintiff further asserts that the VE testified that a GAF score of 40 would preclude

13 employment.  (docket # 16 at 5-6) A VE is not qualified to make judgment regarding medical

14 evidence.  *Sample v. Schweiker*, 694 F.2d 639, 644 n. 6 (9th Cir. 1982)(VE is not qualified

15 to testify regarding "medical implications of the evidence presented.").  Rather, a VE

16 "merely translates factual scenarios into realistic job market possibilities."  *Id.* at 643.

17 Moreover, Dr. Krietsch's 40 GAF score does not represent all of her findings as set forth

18 above. In view of the foregoing, the VE's testimony regarding the GAF score of 40 is not

19 persuasive.

20        **2. Dr. Stewart**

21         Plaintiff also argues that the ALJ erred in rejecting psychiatrist Dr. Stewart's

22 opinion that Plaintiff was markedly limited in his ability to understand detailed instructions,

23 respond appropriately to changes in a routine work setting, and was extremely limited in his

24 ability to respond appropriate to work pressure.  (docket # 16 at 6; Tr. 407-08) The VE

25 testified that work would not be available for an individual with those limitations. (Tr. 439-

26 442) The ALJ explained that he gave "little weight" to Dr. Stewart's September 5, 2006

27 "Supplemental Questionnaire as to Residual Functional Capacity" because Dr. Stewart's

28 findings of "extreme" functional limitations in responding appropriately to work pressures

1   and "marked" limitation in responding to workplace changes were "inconsistent with the

2   other clinical findings, as well as his own therapist's treatment notes." (Tr. 17)  The record

3   supports the ALJ's conclusion.

4           As the ALJ noted, a behavioral update form signed by Dr. Stewart and "clinical

5   liason" Stephanie Knorr contained findings that were inconsistent with the "extreme" and

6   "marked" limitations that Dr. Stewart assessed.  (Tr. 388-89, Tr. 396-97, 399, Tr. 407-08)

7   The May 3, 2006 form stated that "generally things were o.k." with Plaintiff.  (Tr. 388)

8   Additionally, Dr. Stewart and Ms. Knorr assessed Plaintiff a GAF score of 81 which,

9   although it does not correlate directly with disability, indicates that Plaintiff has few or no

10  symptoms, good functioning in several areas, and no more than everyday problems and

11  concerns.  DSM-IV-TR at 34.  Additionally, Dr. Stewart's September 2006 assessment does

12  not include any supporting documentation or other explanation for his findings.  (Tr. 407-08)

13  In view of the foregoing, the ALJ properly afforded little weight to Dr. Stewart's September

14  2006 Residual Functional Capacity Assessment.  *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir.

15  1996)(ALJ properly rejected opinions expressed as a check-off reports that did not contain

16  explanations); 20 C.F.R. § 404.1527(d)(3)(the weight given a medical source opinion is

17  proportional to the degree to which it is supported with medical signs and laboratory

18  findings.); *Batson*, 359 F.3d at 1195 (ALJ properly rejected opinion of treating physicians

19  as they "lacked substantive medical findings to support her conclusion."); *Thomas v.*

20  *Barnhart*, 278 F.3d 948, 957 (9th Cir. 2001)(treating physician's opinion may be rejected if

21  unsupported by doctor's examination record); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th

22  Cir. 2001)(treating physician's opinion properly rejected as treatment notes failed to present

23  "the sort of description and recommendations one would expect to accompany a finding that

24  [claimant] was totally disabled under the [Social Security] Act.").

25          **3. Examining Doctors**

26          Plaintiff further claims that "all examining opinions, from a psychological

27  perspective, suggest that [Plaintiff's] psychological problems do not allow him to sustain

28

1    employment." (docket # 16 at 6)  Contrary to this assertion, the record reflects that none of

2    the examining doctors found Plaintiff disabled due to psychological issues.

3        Plaintiff essentially argues that the findings of state agency doctor Patricia Rose

4    are indicative of disability.  (docket # 16 at 4)  The record does not support Plaintiff's

5    assertion.  As the ALJ noted, Dr. Rose concluded that "[c]ertainly, [Plaintiff] does not appear

6    to be experiencing any major psychiatric disorders that would logically preclude him from

7    performing work-related activities," and that Plaintiff was "a good candidate for Vocational

8    Rehabilitation."  (Tr. 17, 317)

9        The ALJ acknowledged Dr. Rose's opinion that Plaintiff had "fair" limitations

10   in performing complex work and dealing with work stress.  However, the ALJ concluded that

11   those limitations were not supported by the medical record.  This conclusion is supported by

12   substantial evidence.  Dr. Rose's assessment that some of Plaintiff's abilities were "fair" was

13   not based on psychological findings, but on Plaintiff's reported insubordination on the job.

14   (Tr. 316, 320)  Plaintiff reported to Dr. Rose several instances where he was fired or quit a

15   job because he "disagreed with how the job should be done." (Tr. 316)

16       At the hearing before the ALJ, Plaintiff posed a hypothetical to the VE based on

17   an inaccurate description of Dr. Rose's findings.  Dr. Rose opined that Plaintiff's ability to

18   interact with supervisors, deal with work stress, understand, remember and carry out

19   "detailed but not complex" instructions, behave in an emotionally stable manner, relate

20   predictably in social situations, and demonstrate reliability was "fair." (Tr. 319-20) "Fair"

21   was defined as "seriously limited but not precluded." (Tr. 320) Dr. Rose explained that she

22   assessed as "fair" Plaintiff's ability to behave in an emotionally stable manner, relate

23   predictably in social situations, and demonstrate reliability based on Plaintiff's "past history

24   of insubordination with supervisors." (Tr. 320)

25       When Plaintiff posed a hypothetical to the VE based on Dr. Rose's findings he

26   indicated that Dr. Rose considered Plaintiff "*seriously limited*" in his ability to behave in an

27   emotionally stable manner, relate predictably in social situations and demonstrate reliability.

28   The VE testified that work would be precluded for a person with such limitations.  (Tr. 439-

40)  Plaintiff's use of the phrase "seriously limited," was misleading because Dr. Rose had described Plaintiff's foregoing abilities as "fair" meaning "seriously limited *but not precluded*." (Tr. 319-20)    Plaintiff also failed to explain that Dr. Rose's assessment of "fair" was based on Plaintiff's past insubordination with supervisors, not his mental health status examination.  (Tr. 320) Moreover, Plaintiff did not inform the VE that Dr. Rose concluded in the narrative section of her report, that Plaintiff was "not experiencing any major psychiatric disorders that would logically preclude him from performing work-related activities."  (Tr. 317) In view of the foregoing, the VE's testimony based on the "Dr. Rose hypothetical" was based on an incomplete description of Dr. Rose's findings and, therefore, is not persuasive.

In summary, the ALJ sufficiently explained his rationale for not giving deference to the opinions of the treating physicians that were inconsistent with other substantial evidence in the record or with the doctor's own treatment notes.  The Court finds that the ALJ did not err in finding Plaintiff not mentally disabled because substantial evidence supports that conclusion.

### C.  Physical Disability

The ALJ also concluded that Plaintiff was limited to sedentary work that did not include bending to the floor. (Tr. 16, 19) The ALJ's conclusion is supported by substantial evidence in the record.   In support of his conclusion, the ALJ cited Plaintiff's MRI results which showed mild to moderate degeneration.  (Tr. 130-32, 134, 137, 193, 211, 222, 340, 344-45) The ALJ also noted that Plaintiff's most recent MRI, from 2006, showed only a slight progression from the 2002 MRI.  (Tr. 340, 345)  The ALJ noted Dr. Nicol's findings that Plaintiff had good reflexes, normal strength and a negative straight-leg raise test.  (Tr. 134) He also noted Dr. Scott's treatment notes which revealed that Plaintiff's condition was generally stable with his ongoing narcotics prescriptions for low back pain.  (Tr. 362, 387) Finally, the ALJ noted that state agency doctors reviewed the evidence and concluded that Plaintiff could perform light work with additional postural and reaching limitations.  (Tr. 16,

1    121-22, 140-44, 236-40)  Based on this evidence, the ALJ found Plaintiff limited to sedentary

2    work, with bending restrictions.

3           Additional evidence in the record supports the ALJ's findings.  *Warre v. Comm'r,*

4    *Soc. Sec.*, 439 F.3d 1001, 1005 n. 3 (9ᵗʰ Cir. 2006)(citation is permitted to record evidence

5    that bolsters an ALJ's findings even if the ALJ did not cite that evidence).  The ALJ's

6    conclusion that Plaintiff could perform sedentary work is supported by Dr. Saiz's treatment

7    notes which show that Plaintiff's complaints were inconsistent with the objective findings,

8    that Plaintiff was interested in staying off work, and that he violated his narcotics contract.

9    (Tr. 177, 191-94, 210-11) Dr. Saiz ultimately discharged Plaintiff from treatment for these

10   reasons.  (Tr. 177)  The ALJ's conclusion is supported by Dr. Brownsberger's treatment

11   notes that Plaintiff's complaints of pain, both before and after nerve root blocks, were "quite

12   vague."  (Tr. 133, 268)  The ALJ's conclusion is further supported by Dr. Beghin's, Dr.

13   Wolff's, Dr. Bonilla's, and Dr. Hales' examination findings which reported that Plaintiff was

14   in "no acute distress," examination of his back was "unremarkable," and that Plaintiff had

15   normal sensory findings, normal strength, a normal gait, and that the MRI results were

16   "unimpressive." (Tr. 136-37, 151-52, 160, 330-40, 351, 354-55) Additionally, Dr. Bonilla

17   noted that Plaintiff "has failed to go to physical therapy" despite the fact that "it [was] an

18   integral part of his treatment." (Tr. 349) Dr. Saiz also noted that Plaintiff's degenerative

19   changes were "not acute conditions, but were common degenerative conditions" that can start

20   as early as thirty years of age.  (Tr. 211)

21          Plaintiff also asserts that the ALJ erred by not addressing the "off work status"

22   given by Drs. Saiz and Nicol.  (docket # 16 at 6-7)  As an initial matter, the opinions of Drs.

23   Saiz and Nicols regarding Plaintiff's ability to work do not constitute "medical opinion."

24   See, 20 C.F.R. § 416.927(a)(2) & (e). "[A] statement from a treating physician that a

25   claimant is disabled or unable to work is not binding on the Commissioner."  *See*, 20

26   C.F.R. § 416.927(e)(1)(stating that "[w]e are responsible for making the determination or

27   decision about whether you meet the statutory definition of disability . . . A statement by a

28

1    medical source that your are 'disabled' or 'unable to work' does not mean that we will

2    determine that you are disabled.")

3    　　　　Additionally, Plaintiff ignores the fact that both Dr. Saiz and Dr. Nicol merely

4    concluded that Plaintiff should perform less strenuous work, not that he should refrain from

5    all work. (Tr. 134-135, 191, 193)  Both doctors opined that Plaintiff's MRIs results were

6    mild and/or inconsistent with his complaints and that he was not a surgical candidate.  (Tr.

7    134, 177, 191, 193, 211).  Dr. Saiz opined that Plaintiff was attempting to prolong his off-

8    work status and eventually terminated his treatment of Plaintiff. (Tr. 210-11)   The record

9    also reflects that the "off work status" was meant to be temporary while Plaintiff pursued

10   treatment. (Tr. 210, 134)   On October 21, 2002, Dr. Saiz wrote Plaintiff an "off-work"

11   prescription "until the effects of the epidurals were ascertained." (Tr. 210) Dr. Saiz refused

12   to extend that excuse while Plaintiff was vacillating about his treatment plan. (Tr. 210) Dr.

13   Saiz noted his goal of returning Plaintiff to work "as quick as possible."  (Tr. 210-11)

14   Similarly, on November 25, 2002, Dr. Nicol indicated that Plaintiff should pursue "more

15   formal physical therapy" and remain off work until therapy was completed. (Tr. 134)  Dr.

16   Nicol also advised Plaintiff to pursue less strenuous work. (Tr. 134-35) In view of the

17   foregoing, the ALJ did not err by failing to expressly discuss the "off work" status assessed

18   by Drs. Nicol or Saiz.

19   　　　　Plaintiff also argues that the absence of a "work release" indicates that he is

20   disabled.  (docket # 16 at 6) Plaintiff, again, misrepresents the record.  On December 18,

21   2003, Dr. Brownsberger noted that Plaintiff "was given modified work release with limited

22   lifting and bending and the ability to reposition himself on a regular basis." (Tr. 263)

23   　　　　Finally, the record reveals that several treating doctors believed that Plaintiff was

24   inappropriately trying to prolong his off-work status or undermine his treatment. *Warre*, 439

25   F.3d at 1005, n. 3. Physical therapy notes from June and July 2002 indicate that Plaintiff was

26   terminated because he repeatedly missed appointments.  (Tr. 226-30, 278)  Dr. Saiz told

27   Plaintiff his "goal was to get [him] back to work in as quick a manner as possible" and that

28   he "was not willing to keep the patient out of work while he decided on a plan that was

1   proposed to him approximately 13 days before." (Tr. 210-11) He noted that if Plaintiff chose

2   not to pursue available treatment options, he could not be treated.  (Tr. 210-11)

3           Dr. Brownsberger discussed that because Plaintiff was being treated "in the

4   context of the industrial system," it was the doctor's "duty to define . . . modified work

5   activities."  (Tr. 263)  Dr. Bonilla noted that throughout his treatment, Plaintiff "failed to go

6   to physical therapy" while the doctor "insisted . . . that he go to physical therapy and it is an

7   integral part of his treatment."  (Tr. 349)  Dr. Bonilla noted that there was "nothing else

8   procedure wise he would recommend."  (*Id.*)

9           **D.  Residual Functional Capacity**

10          Plaintiff further argues that the ALJ's RFC finding "is not founded by any

11  examining physician."  (docket # 16 at 7)  Plaintiff's argument is limited to this single

12  statement and does not include any citation to factual or legal support.  Moreover, the RFC

13  finding is within the province of the ALJ and, therefore, need not correspond precisely to any

14  physician's findings.  *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001)(stating that "[i]t

15  is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine

16  residual functional capacity.")  Additionally, Dr. Brownsberger's December 2003 treatment

17  notes assess essentially the same limitations which the ALJ found — that Plaintiff had

18  restrictions on bending and lifting with the ability to reposition himself on a regular basis.

19  (Tr. 263)

20          **E.  Dr. Scott's August 2006 Assessment**

21          Plaintiff further argues that remand is necessary on the basis of a "Medical

22  Assessment of Ability to do Work Related Activities" completed by Dr. Scott on August 30,

23  2006.  Again, Plaintiff presents a conclusory argument which contains no citation to legal

24  authority.  (docket # 16 at 7)  Plaintiff claims that Dr. Scott's report was sent to the ALJ on

25  September 5, 2006.  (docket # 15, Exh. 1)  He presents a certified mail receipt dated

26  September 8, 2006.  (*Id.*)   However, the 2006 report was not placed in the record.  (*Id.*)

27  Plaintiff seeks remand for consideration of evidence that he claims was not before the ALJ

28  during the hearing.  A reviewing court may remand based on evidence that was not before

1   the ALJ only if plaintiff demonstrates that the evidence is material and that good cause exists

2   for his failure to present it in a prior proceeding. *Mayes v. Massanari*, 276 F.3d 453, 462 (9th

3   Cir. 2001).  To be "material" the new evidence must "bear directly and substantially on the

4   matter in dispute" and must present a reasonable possibility that it would have changed the

5   outcome if it had been considered by the fact finder. *Mayes*, 276 F.3d at 462 (citing *Booz v.*

6   *Secretary of Health and Human Services*, 734 F.2d 1378, 1380 (9th Cir. 1983)); *Clem v.*

7   *Sullivan*, 894 F.2d 328, 332 (9th Cir. 1990).  To demonstrate good cause, the claimant must

8   demonstrate that the new evidence was unavailable earlier.  *Key v. Heckler,* 754 F.2d 1545,

9   1551 (9th Cir.1985) ("If new information surfaces after the Secretary's final decision and the

10  claimant could not have obtained that evidence at the time of the administrative proceeding,

11  the good cause requirement is satisfied"); *see also Sanchez v. Secretary of Health & Human*

12  *Servs.,* 812 F.2d 509, 512 (9th Cir.1987) (holding that the applicant lacked good cause to

13  remand for consideration of two psychological examinations prepared after the applicant's

14  disability determination when his attorney knew of the applicant's memory loss but failed

15  to explain why the applicant had not requested a mental evaluation or pressed his mental

16  impairment claim at the hearing before the ALJ). The claimant must also establish good

17  cause for not having sought the expert's opinion earlier. *Clem,* 894 F.2d at 332.  Plaintiff

18  does not even attempt to establish materiality or cause.  And even assuming Plaintiff could

19  somehow establish cause, as discussed below, he cannot show that the report was material.

20  Dr. Scott treated Plaintiff from April 2005 to June 2006.  (Tr. 362-87) He consistently

21  described Plaintiff as being in no acute distress.  (*Id.*)  He described Plaintiff as healthy for

22  his age with normal reflexes and no paraspinal discomfort.  (Tr. 385)  On August 30, 2006,

23  Dr. Scott completed a check-marked form without providing any supporting narrative.

24  (Plaintiff's Exh. 1 at 3-5) Dr. Scott's 2006 assessment indicates that Plaintiff's activities were

25  limited by pain and fatigue of a "moderately severe" level and that Plaintiff could sit or

26  stand/walk for one hour in an eight hour day, frequently lift up to five pounds, occasionally

27  carry up to five pounds, and occasionally lift 10 pounds.  (docket # 15, Exh. 1 at 3-4)

28

1    Because Dr. Scott's 2006 assessment does not appear in the record, it is not clear

2    whether the ALJ had the 2006 report before him when he rendered his opinion.  However,

3    the transcript of the 2006 hearing reveals that Plaintiff asked the VE a hypothetical based on

4    Dr. Scott's 2006 assessment (Tr. 443-44) which the ALJ considered "pretty vague" and did

5    not require the VE to answer the question.  (Tr. 443-44)  Additionally, in his opinion, the

6    ALJ expressly addressed Dr. Scott's treatment records and noted that they showed stability

7    in Plaintiff's condition with narcotic treatment.  (Tr. 16, 362-87) *Batson*, 359 F.3d at 1195;

8    *Thompson*, 278 F.3d at 957. Dr. Scott's treatment notes do not support his 2006 assessment.

9    Dr. Scott's treatment notes merely indicate lumbar discomfort with range of motion testing

10   and palpation, and rising with a stooped and stiff posture. (Tr. 362-87).  In view of the

11   inconsistency between Dr. Scott's treatment notes which span over a year and his August

12   2006 assessment form which contains absolutely no explanation, the  2006 assessment does

13   not present a reasonable possibility that it would have changed the outcome if it had been

14   considered by the ALJ.  *Booz*, 734 F.2d at 1480; *Clem v. Sullivan*, 894 F.2d 328, 332 (9th Cir.

15   1990); *Rollins*, 261 F.3d at 856 (treating physician's opinion properly rejected as treatment

16   notes failed to present "the sort of description and recommendations one would expect to

17   accompany a finding that [the claimant] was totally disabled under the [Social Security]

18   Act.")

19   **VI. CONCLUSION**

20   The ALJ did not commit legal error in failing to give more weight to Dr.

21   Krietsch's 40 GAF score and Dr. Stewart's assessment of Plaintiff's limitations.  Moreover,

22   the record contains substantial evidence in support of the ALJ's conclusion that Plaintiff was

23   not disabled.  The ALJ also correctly assessed Plaintiff's residual functional capacity.  The

24   Court will therefore deny Plaintiff's Motion for Summary Judgment and grant Defendant's

25   Cross-Motion for Summary Judgment.  In summary, the ALJ properly assessed the evidence

26   and concluded that Plaintiff was capable of performing a range of sedentary work.

27   Additionally, Plaintiff has failed to show that Dr. Scott's August 2006 report, which Plaintiff

28   submitted with his motion for summary judgment, warrants remand.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (docket # 15) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Cross-Motion for Summary Judgment (docket # 18) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment against Plaintiff and in favor of Defendant.

DATED this 17th day of December, 2007.

Lawrence O. Anderson
United States Magistrate Judge